Filed 7/31/23  Kaplan v. NBCUniversal Media CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BEN KAPLAN, | B313911 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV35842) |
| v. | |
| NBCUNIVERSAL MEDIA LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael P. Linfield, Judge.  Affirmed.

Loeb & Loeb, David Grossman and Mary Balzer for Defendants and Appellants.

Foley Bezek Behle & Curtis, Roger N. Behle, Jr., and Kevin D. Gamarnik for Plaintiff and Respondent.

——————————————

Plaintiff brought the present action against an actor, the actor's manager and agent, and a film studio, among others. The operative complaint alleges that plaintiff created a screenplay based on the life of Winston Churchill which he shared with defendants. Plaintiff, the actor, the agent, and the manager agreed to make and distribute a film based on plaintiff's screenplay, but days before a written contract was to be signed, the actor, manager, and agent pulled out of the project and instead made a competing movie about Winston Churchill with another film studio that misappropriated many of plaintiff's unique ideas and approaches without crediting or compensating him. The complaint alleges that defendants' actions gave rise to a variety of causes of action, including for breach of express and implied-in-fact contract, interference with contract and prospective economic advantage, and unfair competition.

Defendants brought a special motion to strike each of plaintiff's causes of action pursuant to California's anti-SLAPP statute (Code Civ. Proc., § 425.16.)[1] The trial court found that the complaint's allegations did not arise out of activity protected by the statute, and thus it denied defendants' motion. Defendants appeal.

We affirm. Like the trial court, we conclude that defendants did not meet their burden to establish that plaintiff's causes of action arise out of conduct in furtherance of defendants' rights of free speech in connection with an issue of public interest. The trial court thus properly denied the special motion to strike.

---

[1] All subsequent undesignated statutory references are to the Code of Civil Procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.　Background.

Plaintiff Ben Kaplan filed the present action in September 2020 against defendants NBCUniversal Media, LLC (NBCUniversal), Working Title Group LLC (Working Title), Focus Features LLC (Focus Features), Gary Oldman, Douglas Urbanski, Douglas Management, Ltd. (Douglas Ltd.), Douglas Management Group, LLC (Douglas LLC),[2] and Jim Osborne.  The operative first amended complaint alleges as follows:

Kaplan is a teacher and screenwriter.  Over many years beginning in 1999, he wrote a movie script about Winston Churchill initially titled Captain of the Gate, and later titled Churchill (hereafter, Churchill).  In 2011, Kaplan continued developing his script with the help of Cameron Lamb, an independent movie producer.[3]

In early April 2013, Lamb approached Jim Osborne, the agent for actor Gary Oldman, about engaging Oldman to play the lead role in a film based on Kaplan's script.  In May 2013, Lamb emailed Osborne a copy of the Churchill script with offers for Oldman to portray Winston Churchill, and for Oldman's manager, Douglas Urbanski, to act as executive producer.

---

[2]　Douglas Ltd. and Douglas LLC are alleged to be entities through which Urbanski conducts his business.  We will sometimes refer to Urbanski, Douglas Ltd., and Douglas LLC collectively as Urbanski.

[3]　The operative complaint alleges that Lamb conducted his business through a limited liability company, which assigned to Kaplan any and all rights it had to bring claims against defendants for their conduct as alleged in the complaint.

In July 2013, Kaplan's agents sent a revised draft of the script to Lucas Webb, a development executive at Working Title, a film production company. The script was provided to Webb in confidence and with the understanding that it would not be shared or used without appropriate credit and compensation to Kaplan. The following month, Webb told Kaplan that he had enjoyed the script, and he asked whether Kaplan and Lamb were looking for creative or financial partners. Lamb said he had already partnered with StudioCanal, a production and distribution company, and Sierra/Affinity, a finance and sales company, for financing and distribution. Webb responded that he would like to keep in touch and have another conversation if Lamb was interested in looking " 'for another home.' "

In September 2013, Lamb emailed a second offer to Oldman and Urbanski and attached a revised version of the script. A few days later, Osborne responded that after deliberating, Oldman had concluded he would not participate in Kaplan's project.

In November 2013, Lamb and Webb met in person, and Webb tried to persuade Lamb to drop his partners and instead make a film based on Kaplan's script with Working Title. Webb said he had always wanted to do a film about Winston Churchill, and Kaplan had figured out a way to do it. Lamb declined.

Throughout 2014, Lamb continued to court Oldman through his representatives. Kaplan made further revisions to his script, which Lamb shared with Urbanski, Osborne, and Oldman.

After reading the revised script, Urbanski and Oldman expressed interest in making a film based on it. Urbanski, Osborne, and Lamb met on January 15, 2015, at which time Osborne and Urbanski said that Oldman was on board to play

4

the lead role in Churchill for $6 million, provided that Lamb secured a suitable director.  Osborne and Urbanski urged Lamb to reengage with a director, Saul Dibb, who previously had been attached to the Churchill project.  The following month, Urbanski and Dibb had a two-hour phone call regarding Churchill.

In February 2015, Urbanski told Lamb that he was getting daily phone calls from Working Title urging Oldman to abandon the Churchill project and sign on with them to play the role of Winston Churchill in a film they were developing.  Also in February, Osborne emailed Lamb to advise that he and Urbanski had spoken to a talent agency about representing Churchill in North America, and Lamb and Urbanski discussed voice training and prosthetics for Oldman.

On March 9, 2015, Sierra/Infinity advised Oldman's counsel, and Lamb advised Osborne, that Oldman's counsel would soon receive a long form contract formally documenting their agreement with Oldman.  The following day, however, Oldman pulled out of the Churchill project.  It was later announced that Oldman was in talks with, and then engaged, to play the role of Winston Churchill in Darkest Hour, which was produced by Working Title and distributed by Focus Features and Universal Pictures, both subsidiaries of NBCUniversal.  Urbanski was a producer on the film.

Darkest Hour misappropriated many scenes and story lines from Kaplan's script, including many ahistorical/fictional ideas conceived by Kaplan.  For example, Darkest Hour "introduces the audience to a disheveled and dyspeptic Winston Churchill in bed.  Shortly thereafter, he casually exposes himself to a young female staffer, who reacts with embarrassment; this was Mr. Kaplan's idea."  Similarly, Darkest Hour "depicts Churchill—faced with

imminent and massive disaster—creatively conceiving a strategy to assemble a civilian armada of small vessels to bolster the rescue mission at Dunkirk and initiating the order to summon the civilian fleet. Attributing to Churchill the idea of the civilian armada and the order that it be mustered was an ahistorical, fictional invention of Mr. Kaplan. This idea was taken by Defendants and used in *Darkest Hour*."

The operative complaint alleges seven causes of action, as follows:

Breach of joint venture agreement (against Urbanski and Osborne): Through the conduct alleged, the parties entered into a joint agreement to turn the Churchill script into a feature film with Oldman playing the lead role and Urbanski acting as a director. Kaplan performed everything required of him under the terms and conditions of the joint venture, but defendants breached the joint venture agreement by abandoning the joint venture to work with competitors, including appropriating Kaplan's script for Darkest Hour and assisting in Darkest Hour's creation, development, and production.

Breach of implied-in-fact contract (against Urbanski, Osborne, Oldman, and Working Title): Kaplan shared his ideas and approaches to telling Winston Churchill's story with defendants with their promise that, if his ideas and approaches were used, he would be compensated. Kaplan clearly conditioned his offer to disclose his scripts on defendants' agreement to pay for them if they were used. Accordingly, an implied-in-fact contract arose between Kaplan, on the one hand, and defendants, on the other. Defendants breached this contract by taking specific ideas from Kaplan's script to make Darkest Hour, without crediting or compensating Kaplan.

6

Unfair Business Practices (against all defendants): Defendants' alleged actions constituted unlawful and unfair business practices in violation of California's Unfair Competition Law (Bus. & Prof. Code, § 17200).

Intentional interference with contract and intentional interference with prospective economic advantage (against Working Title): Kaplan entered into an agreement for Oldman to star in a feature film based on the Churchill script, and for Urbanski to receive a producer credit in exchange for his help in developing and realizing the Churchill film. Working Title knew of the agreement between Kaplan, on the one hand, and Oldman and Urbanski, on the other. Working Title's intentional acts were designed to induce, and did induce, a breach or disruption of these contractual relationships and/or prospective economic relationships.

Breach of fiduciary duty (against Urbanski and Osborne): By virtue of the joint venture described above, a fiduciary relationship arose between Kaplan, on the one hand, and Urbanski and Osborne, on the other. Urbanski and Osborne breached their fiduciary duties by abandoning the joint venture to work with competitors, appropriating ideas from Kaplan's script for Darkest Hour, and assisting in the creation, development, and/or production of Darkest Hour.

Aiding and abetting breach of fiduciary duty (against Working Title): Working Title knew of Urbanki's and Osborne's fiduciary duties to Kaplan and assisted and/or encouraged Urbanki and Osborne to breach those fiduciary duties by poaching Oldman from the Churchill project and misappropriating ideas from Kaplan's script.

## II.  Special motion to strike (§ 425.16).

Defendants filed a special motion to strike each cause of action (except for the second cause of action as against Working Title) pursuant to section 425.16.  Defendants asserted that under California law, the creation of entertainment content, such as a film, constitutes an act in furtherance of the exercise of the right to free speech and thus is protected activity under the anti-SLAPP statute.  According to defendants, each of Kaplan's causes of action was based on the production and distribution of Darkest Hour, and thus each arose from protected activity.  Further, Darkest Hour concerned an issue of public interest—namely, the life of Winston Churchill and the Allied forces' response to Nazi Germany in World War II.  Finally, defendants asserted that Kaplan could not demonstrate that he was likely to prevail on any of his causes of action.  In support, defendants submitted the declarations of Osborne, Urbanski, and attorney Nigel Pearson, each of whom stated that defendants never entered into any agreement with Kaplan or Lamb regarding the production of Churchill.

Kaplan opposed the special motion to strike.  He asserted that defendants had not shown that any cause of action arose from protected activity—that is, that protected activity was the alleged injury-producing act that formed the basis for the claims.  He further asserted that each cause of action had, at least, minimal merit.  In support, he filed his own declaration and the declarations of Lamb and attorney Jordan Liebman, which

8

discussed, among other things, the alleged course of negotiations between the parties.[4]

After a June 18, 2021 hearing, the trial court denied the special motion to strike, finding that defendants failed to meet their initial burden to show that Kaplan's complaint was based on conduct protected by the anti-SLAPP statute. The court explained: "Contrary to Defendants' assertion, the gravamen of Plaintiff's claims is not based on the creation of Darkest Hour itself . . . . Instead, the gravamen of Plaintiff's claims against Defendants stem from allegations that Defendants took Plaintiff's ideas without paying him and caus[ed] the collapse of his movie project resulting from the loss of his movie project's team members."

Defendants timely appealed from the order denying the special motion to strike.[5]

## DISCUSSION

### I. General legal principles and standard of review.

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits

---

[4] The parties filed evidentiary objections to each other's declarations. The court declined to rule on these objections, finding them immaterial to its disposition of the motion to strike. Because the evidentiary objections are not relevant to our analysis, we do not detail them.

[5] Kaplan cross-appealed from the trial court's order denying his motion to conduct discovery prior to filing an opposition to the special motion to strike (§ 425.16, subd. (g)). Because we conclude that the trial court properly denied the special motion to strike, we need not address Kaplan's cross-appeal.

that might chill the exercise of their rights to speak and petition on matters of public concern.  (See § 425.16, subd. (a); *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619 [(*Rand*)]; *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)"  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).)  To that end, section 425.16, subdivision (b)(1) provides:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

An " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e).)

The analysis of an anti-SLAPP motion involves two steps.  "Initially, the moving defendant bears the burden of establishing

that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) A claim arises from protected activity "when that activity underlies or forms the basis for the claim." (*Id.* at p. 1062.) Accordingly, "in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id.* at p. 1063; see also *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1015 (*Bonni*) ["[A] claim is subject to an anti-SLAPP motion to strike if its elements arise from protected activity"].)

An anti-SLAPP motion can be brought in response to "a ' "mixed cause of action" '—that is, a cause of action that rests on allegations of multiple acts, some of which constitute protected activity and some of which do not." (*Bonni, supra,* 11 Cal.5th at p. 1010; see also *Baral v. Schnitt* (2016) 1 Cal.5th 376, 393 (*Baral*) ["an anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded"].) In that event, "courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni,* at p. 1010.)

If the defendant carries its burden to demonstrate that plaintiff's claims arise from protected activity, the plaintiff must then demonstrate its claims have at least " 'minimal merit.' " (*Wilson, supra,* 7 Cal.5th at p. 884.) To do so, "plaintiff must show the complaint is legally sufficient and ' " 'supported by a

11

sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' . . ." ' " (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 488.)

An order granting or denying a special motion to strike is appealable. (§ 425.16, subd. (i); § 904.1, subd. (a)(13).) Our review is de novo. (*Park, supra*, 2 Cal.5th at p. 1067.)

## II. Kaplan's claims do not arise from acts in furtherance of defendants' rights of free speech.

As noted above, a defendant's initial burden under the anti-SLAPP statute is to "identify the acts alleged in the complaint that it asserts are protected and what claims for relief are predicated on them." (*Bonni, supra*, 11 Cal.5th at p. 1010.) Thus, the defendant must "identify the activities each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' (*Park, supra,* 2 Cal.5th at p. 1060.)" (*Wilson, supra*, 7 Cal.5th 884.)

To determine whether a claim arises from protected activity, "courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' (*Id.* at p. 1063.) Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson, supra*, 7 Cal.5th at p. 884.)

Critically, " 'the defendant[s'] act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the

12

right of petition or free speech." [Citations.] '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' [Citations.] Instead, the focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' [Citation.] 'The only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e). . . .' " (*Park, supra*, 2 Cal.5th at p. 1063.)

Courts have noted that "[t]here is a 'distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim.' " (*Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 776.) In other words, "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral, supra*, 1 Cal.5th at p. 394.) Phrased another way, the relevant question for anti-SLAPP purposes is whether "the ' "core injury-producing conduct upon which the claim is premised" ' arise[s] out of protected activity? (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594 [*Area 51 Productions*].)" (*Starr v. Ashbrook* (2023) 87 Cal.App.5th 999, 1020.)

As relevant to the present case, the parties agree that artistic expression is protected free speech activity under the

13

anti-SLAPP statute. They disagree, however, about whether any of Kaplan's causes of action "aris[e] from" acts in furtherance of defendants' rights of free speech within the meaning of the anti-SLAPP statute. Defendants urge that each of plaintiff's causes of action is subject to the anti-SLAPP statute because each is based on the making of Darkest Hour—that is, from the creation of a film—which defendants urge is quintessential free speech activity. Plaintiff contends to the contrary, urging that the injury-producing activity was not defendants' making of Darkest Hour. Instead, plaintiff says, each cause of action alleges injury resulting from "(a) the failure to pay [plaintiff] for the use of [his] ideas; and (b) Osborne, Urbanski, and Oldman leaving the *Churchill* project. For the reasons that follow, plaintiff is correct.

### A.   Breach of implied-in-fact contract (second cause of action).

In *Desny v. Wilder* (1956) 46 Cal.2d 715 (*Desny*), the California Supreme Court held that an idea can be the subject of an express or implied contract, and its disclosure and submission can be consideration for a promise to pay compensation. A plaintiff therefore may have a cause of action in contract for disclosing an idea to a defendant who uses it without compensation. (*Id.* at pp. 738, 744; *Spinner v. American Broadcasting Companies, Inc.* (2013) 215 Cal.App.4th 172, 184 (*Spinner*).)

To prevail on a cause of action for breach of implied-in-fact contract in an idea submission case, a plaintiff must show that "(1) [he] clearly conditioned the submission of [his] ideas on an obligation to pay for any use of [his] ideas; (2) the defendants, knowing this condition before the plaintiff[ ] disclosed the ideas, voluntarily accepted the submission of the ideas; and (3) the

14

defendants found the ideas valuable and *actually used* them—that is, the defendants based their work substantially on the plaintiff'[s] ideas, rather than on their own ideas or ideas from other sources." (*Spinner*, *supra*, 215 Cal.App.4th at p. 184.)

Here, the second cause of action for breach of implied-in-fact contract alleges that Kaplan "clearly conditioned his offer to disclose his scripts, and reveal his unique ideas and approaches on an obligation for Defendants to pay for them if they were used by Defendants," but defendants "breached this contract by . . . taking specific ideas from Mr. Kaplan and using those ideas to make *Darkest Hour*" without crediting or compensating him. As a result, Kaplan allegedly was harmed "by the failure of Defendants to credit and compensate him for the use of his ideas in *Darkest Hour*."[6]

---

[6] Defendants contend that there is no credible claim that Urbanski, Osborne, or Oldman are being sued for using Kaplan's ideas without compensating him because Kaplan's and Lamb's declarations "are absolutely clear" that "Oldman was never asked to 'pay' for anything." Not so. The operative complaint alleges that Kaplan "shared his ideas and approaches [to] the telling of the story of Winston Churchill with [Urbanski, Osborne, and Oldman] *with their promise that, to the extent that Mr. Kaplan's ideas and approaches were used, he would be compensated."* (Italics added.) Kaplan's declaration is similar; he asserts: "The sharing of my script in conjunction with the May 13, 2013 offer was not to simply share my movie ideas with Messrs. Oldman, Osborne, and Urbanski. The sharing of my script was always done with the expectation that it would lead to me earning income and/or credit from the use of my ideas in that script." Webb's declaration does not address the issue of compensation at all, and thus it is not inconsistent with Kaplan's declaration or with the allegations of the complaint.

15

There are two ways to characterize this allegation. According to defendants, the breaching conduct—that is, the conduct on which the cause of action is based—was the making of Darkest Hour. Kaplan urges otherwise, contending that the breaching conduct was not the making of Darkest Hour, but the failure to pay him for his script. We agree with Kaplan that the breaching conduct—that is, the " 'core injury-producing conduct upon which the plaintiff's claim is premised' " (*Area 51 Productions*, *supra*, 20 Cal.App.5th at p. 594)—was using the Churchill script without compensation, *not* making Darkest Hour. This is clear from the complaint, which alleges that Kaplan shared his scripts with defendants for the express purpose of making a film; that Kaplan conditioned his disclosure of his scripts on defendants' promise to pay for the scripts if they used them; and that defendants made a film based on Kaplan's script but did not compensate him. In other words, Kaplan does not allege that defendants did not have the right to make a film based on his scripts, but instead that, having done so, they were contractually required to pay him for their use.

Our conclusion is consistent with that of the Ninth Circuit in *Jordan-Benel v. Universal City Studios, Inc*. (9th Cir. 2017) 859 F.3d 1184 (*Jordan-Benel*). There, the plaintiff's manager submitted a screenplay written by the plaintiff to a talent agency, which indicated it would " 'pass' " on it. (*Id*. at p. 1187.) However, someone at the talent agency allegedly sent the screenplay to another screenwriter, who then wrote a script that copied ideas from the plaintiff's script. A film (The Purge) based on the plaintiff's script was made and released. (*Ibid*.) The plaintiff filed an action against the talent agency and production companies for copyright infringement, implied-in-fact contract,

16

and declaratory relief, seeking a declaration of the plaintiff's right to credit and payment for the production and sale of the film and its sequels. (*Ibid.*)  The defendants filed a special motion to strike the contract and declaratory relief claims, which the district court denied.  The defendants appealed.  (*Id.* at p. 1188.)

The Ninth Circuit affirmed.  It explained that to determine whether the defendants had met their step one burden under the anti-SLAPP statute, it asked two questions:  "(1) From what conduct does the claim arise? and (2) Is that conduct in furtherance of the rights of petition or free speech?"  (*Jordan-Benel*, *supra*, 859 F.3d at p. 1190.)  In the case before it, the defendants argued that the relevant conduct was "the creation, production, distribution, and content of the films" because the plaintiff would not have a claim but for that activity.  The plaintiff, in contrast, urged that his claims did not arise from the making and distribution of the films because those were not the wrongful acts that gave rise to his claims; instead, plaintiff's claims arose out of defendants' failure to pay him for using his script.  (*Ibid.*)  The Ninth Circuit agreed with the plaintiff, concluding that the conduct underlying the breach of implied-in-fact contract claim was the defendants' failure to pay for the use of the plaintiff's screenplay.  It explained:  "Defendants are correct that the creation of *The Purge* films was not collateral to the principal purpose of the transaction between Jordan-Benel and Defendants.  But Jordan-Benel's claim does not challenge the activity of filmmaking at all.  In fact, he desperately wanted the film to be made.  Because the 'overall thrust of the complaint' challenges Defendants' failure to pay for the use of his idea, we

17

hold that the failure to pay is the conduct from which the claim arises." (*Id*. at p. 1191.)

In so concluding, the Ninth Circuit acknowledged that the plaintiff would have no claim but for the production and release of The Purge films. Nonetheless, it said, "the target of Jordan-Benel's claim is not actually the expressive works (*The Purge* films)." (*Jordan-Benel*, *supra*, 859 F.3d at p. 1192.) Accordingly, applying a but for analysis "would threaten to subject plaintiffs to the burden and expense of litigating anti-SLAPP motions in cases where protected free speech activity is not the focus of the claim." (*Ibid*.)

The Court of Appeal reached a contrary result in *Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802 (*Musero*). There, the plaintiff, a writer, sued his former talent agents for breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing, asserting that the agents had misappropriated the writer's proposed television pilot and used that material to develop a competing project of the same name with another client, producer Jerry Bruckheimer. (*Id*. at p. 807.) Specifically, the plaintiff alleged that after he provided the agents with a script for a television pilot titled *Main Justice*, which was based loosely on the Department of Justice and Attorney General Eric Holder, the agents created a pitch document for Bruckheimer and his associates that "was preceded by, borrowed from, and harvested the concept, pitch, series overview and pilot created by [the writer] under the same title." (*Id*. at p. 809.) The agents filed a special motion to strike the complaint's allegations that they had misappropriated the plaintiff's *Main Justice* pilot script, urging that those allegations arose out of free speech on a matter of public importance. The

trial court denied the motion, concluding the agents had demonstrated that the plaintiff's allegations arose out of protected speech, but the plaintiff had carried his burden of demonstrating a reasonable probability of success on the merits. (*Id.* at p. 813.)

The Court of Appeal affirmed, although for different reasons than those articulated by the trial court. The appellate court found that creating a television show was an exercise of constitutionally protected expression, and steps taken to advance such expression are properly considered conduct in furtherance of the exercise of the right of free speech within the meaning of section 425.16, subdivision (e)(4). (*Musero*, *supra*, 72 Cal.App.5th at p. 817.) However, the court concluded that the challenged conduct did not concern an issue of public interest. (*Id.* at p. 820.) It explained: "[W]hen the context and content of the specific, allegedly wrongful statements at issue here are considered, the degree of connection between those statements and that topic of public interest is insufficient to warrant protection under section 425.16, subdivision (e)(4)." (*Id.* at p. 821.)

In concluding that the plaintiff's claims arose out of protected speech, the court expressly rejected the Ninth Circuit's reasoning in *Jordan-Benel*. It explained: "[T]he Ninth Circuit's *Jordan-Benel* opinion, like Musero's argument in this court, is based on a pre-*Baral* 'principal thrust or gravamen' approach to determining whether an entire cause of action arises from protected activity, and is inconsistent with *Baral*, as well as the Supreme Court's recent reiteration of the proper first step analysis in *Bonni*, *supra*, 11 Cal.5th 995. [Fn. omitted.] As *Bonni* and *Baral* instruct, whatever the purported 'target' of a

19

cause of action, if protected speech activity supplies an element of the claim, the burden shifts to the plaintiff to demonstrate a reasonable probability of prevailing on the merits. Unquestionably in the case at bar, [the defendants'] alleged participation in the creation and development of [Bruckheimer's] version of *Main Justice*, protected activity, is 'not just evidence of liability or a step leading to some different act for which liability is asserted' (*Park*, *supra*, 2 Cal.5th at p. 1060), but provides an element of Musero's breach of fiduciary duty and breach of contract causes of action." (*Musero*, *supra*, 72 Cal.App.5th at p. 819.)

We do not agree with *Musero* that *Jordan-Benel*'s analysis is inconsistent with *Baral* and *Bonni*. While those cases disavowed a "gravamen" approach where a single cause of action is based on more than one alleged wrongful acts—a so-called " 'mixed' causes of action" (*Baral*, *supra*, 1 Cal.5th 384)—neither case suggested that it was error for a court to consider, as *Jordan-Benel* did, whether expressive conduct was a "target" of a plaintiff's claim. (*Jordan-Benel*, *supra*, 859, F.3d at p. 1192.) To the contrary, *Bonni* provided the following guidance for lower courts: "To be clear, we do not suggest that every court that has continued to label its approach a gravamen test even after *Baral* has erred. Some courts have invoked the term not in the way Bonni suggests—to determine the essence or gist of a so-called mixed cause of action—but instead to determine whether particular acts alleged within the cause of action supply the elements of a claim (see *Park*, *supra*, 2 Cal.5th at p. 1063) or instead are incidental background (see *Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 111 ['The "gravamen is defined by the *acts on which liability is*

20

*based*, not some philosophical thrust or legal essence of the cause of action" ']; accord, *Area 51 Productions,* [*supra,*] 20 Cal.App.5th [at pp.] 594–601; *Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, 885–886). This approach is consistent with *Baral,* which reaffirmed that '[a]ssertions that are "merely incidental" or "collateral" are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' (*Baral, supra*, 1 Cal.5th at p. 394.) [¶] Here, too, we may consider whether Bonni's various allegations supply the elements of a retaliation claim or merely provide context." (*Bonni, supra*, 11 Cal.5th at p. 1012.)

Under *Baral*, *Park*, and *Bonni*, therefore, the question for us is what act or acts supply the elements of Kaplan's *Desny* claim. Like the *Jordan-Benel* court, we conclude the relevant act—or, in the language of *Area 51 Productions*, the "core injury-producing conduct upon which the plaintiff's claim is premised" (20 Cal.App.5th at p. 594)—is using Kaplan's script without compensation. While defendants' production of Darkest Hour was a necessary predicate for the claim, it did not *itself* support a claim for recovery because it was the failure to pay—not the making of the movie—that is alleged to have caused Kaplan harm. And, because a failure to pay is not alleged to be an act in furtherance of free speech, Kaplan's *Desny* claims do not arise out of protected activity within the meaning of the anti-SLAPP statute. (See *Zacchini v. Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 578–579 [First Amendment not violated by allowing entertainer to sue newscaster for unauthorized broadcast of his performance: "There is no doubt that entertainment, as well as news, enjoys First Amendment

21

protection. But it is important to note that neither the public nor respondent will be deprived of the benefit of petitioner's performance as long as his commercial stake in his act is appropriately recognized. *Petitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it.*"], italics added; *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.* (5th Cir. 1979) 600 F.2d 1184, 1188 [First Amendment not a license to trammel intellectual property rights].)

### B.  Breach of express contract and breach of fiduciary duty (first and sixth causes of action).

The elements of breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) The elements of breach of fiduciary duty are " ' (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach.' " (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 646.)

Kaplan's first cause of action alleges that Kaplan, Urbanski, and Osborne entered into a contract to "develop, produce, film, and release a feature film based on [the *Churchill* script] with Gary Oldman playing the titular role." Kaplan "performed all the conditions, covenants, and promises required by him to be performed in accordance with the terms and conditions of the joint venture," but Urbanski and Osborne "breached the parties' joint venture agreement by abandoning the joint venture to work with competitors, appropriating Mr. Kaplan's script for *Darkest Hour*, and assisting in the creation, development, and/or production of *Darkest Hour*," causing Kaplan

harm.  The sixth cause of action alleges that a fiduciary duty existed between Kaplan, Urbanski, and Osborne as a result of this contract, and Urbanski and Osborne breached their fiduciary duties by "abandoning the joint venture to work with competitors, appropriating ideas from Mr. Kaplan's script for *Darkest Hour*, and assisting in the creation, development, and/or production of *Darkest Hour*."

Defendants contend that the breach of contract and breach of fiduciary duty claims arise from protected activity because they allege that defendants "violated legal obligations to [Kaplan] by working with other writers and producers in connection with the creation of a protected work"—that is, by making Darkest Hour.  We do not agree.  Urbanski's and Osborne's contractual obligations as alleged in the first cause of action were to assist in the development, production, and release of a feature film based on Kaplan's script.  As such, the contract or defendants' fiduciary duties thereunder were allegedly breached by Urbanski's and Osborne's *failure to* assist in the film's development, production, and/or release.  But since the complaint does not allege that defendants also entered into a binding agreement with Kaplan to refrain from producing other films, the making of Darkest Hour is not an independent basis for liability, but merely explains *why* defendants abandoned the Churchill project.  In other words, under the *Baral/Bonni* rubric, the reference to the making of Darkest Hour "merely provide[s] context, without supporting a claim for recovery."  (*Bonni*, *supra*, 11 Cal.5th at p. 1012.) Because this assertion thus is " 'merely incidental' or 'collateral' " to the first cause of action, it " 'cannot be stricken under the anti-SLAPP statute.' "  (*Ibid.*)

23

In support of their contention that Kaplan's breach of contract and breach of fiduciary duty claims arise out of protected activity, defendants cite *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027 (*Ojjeh*). The complaint in *Ojjeh* alleged that defendant Brown solicited $180,000 from the plaintiff to produce a documentary on the Syrian refugee crisis but defendant used the plaintiff's investment for purposes unrelated to the film and did not make substantial progress towards completing the film. The defendant filed a special motion to strike, which the trial court denied. (*Id.* at p. 1032.) The Court of Appeal reversed. It noted that the complaint did not allege that defendant performed *no* work on the documentary, but instead acknowledged that the defendant had hired a cinematographer who shot some footage for the documentary. (*Id.* at p. 1038.) This allegation was "reasonably viewed as . . . 'in furtherance' of the documentary" because "[i]t goes without saying that in order to produce a documentary, a filmmaker must obtain footage and collect information on the subject matter." (*Id.* at pp. 1139–1040.) The court similarly concluded that the complaint's allegations that the defendant solicited funds and then used those funds for purposes unrelated to the documentary was reasonably viewed as conduct in furtherance of the documentary's production because "there appears no dispute that application of such funding towards the documentary would have furthered or helped advance the project." (*Id.* at p. 1040.) Thus, the court concluded, "defendants' alleged conduct of soliciting investment funds and performing partial work on the documentary was, for anti-SLAPP purposes, in furtherance of producing the documentary in the exercise of the right of free speech." (*Id.* at p. 1042.)

24

To the extent that *Ojjeh* stands for the proposition that *any* conduct preliminary or related to the making of a film arises out of protected speech, we disagree. As we have discussed, our Supreme Court has held that a cause of action is subject to a special motion to strike only if a defendant's alleged act underlying a plaintiff's cause of action is " '*itself* . . . an act in furtherance of the right of petition or free speech.' " (*Park*, *supra*, 2 Cal.5th at p. 1063.) In other words, " '[t]he only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in [section 425.16,] subdivision (e). . . .' " (*Ibid.*, quoting *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66, italics omitted.) Plainly, not all injurious conduct that occurs preliminary to, or in connection with, the making of a film raises free speech concerns—for example, we would be hard pressed to conclude that a claim alleging that a caterer breached a contract to provide lunch to the cast and crew on a movie set raised free speech concerns, even though the meals to be provided unquestionably would have "furthered or helped advance" the making of the film. (*Ojjeh*, *supra*, 43 Cal.App.5th at p. 1040.) We similarly would find no free speech concerns in connection with a claim that a vendor breached a contract to deliver paint to be used to make a movie set, or that a property owner breached an agreement to allow his property to be used for filming a movie, even if these alleged breaches had the effect of delaying the movie's production.

It is true, as defendants contend, that many acts that " 'advance or assist' the creation and performance of artistic

works are acts in furtherance of the right of free speech for anti-SLAPP purposes." (See *Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1106.) But expanding that principle as far as defendants would have us do here would have the effect of allowing the anti-SLAPP mechanism to be used to strike claims for relief in contexts that raise no First Amendment concerns. And while we acknowledge that freedom of expression requires some " 'breathing space' " to survive (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 271–272), a construction of the anti-SLAPP statute that defines protected conduct as *any* conduct preliminary to, or in connection with, the making of a film simply goes too far. (See *Wilson*, *supra*, 7 Cal.5th at pp. 893–894 ["A news organization's hiring or firing of employees—like virtually everything a news organization does—facilitates the organization's speech to some degree. *But it does not follow that everything the news organization does qualifies as protected activity under the anti-SLAPP statute.* The First Amendment does not immunize news organizations from laws of general applicability 'simply because their enforcement . . . has incidental effects on [the press's] ability to gather and report the news' "], italics added.)

Defendants also contend that if the first and sixth causes of action are based on failing to make a film based on Kaplan's script, rather than on making and distributing Darkest Hour in 2017, then Kaplan's claims are barred by the statute of limitations. Perhaps so, but that fact does not support defendants' contention that their special motion to strike should have been granted. As we have said, a plaintiff is required to demonstrate arguable merit in opposition to an anti-SLAPP motion only as to claims based on protected conduct. (See *Wilson*,

*supra*, 7 Cal.5th at p. 884 [" 'If the defendant carries its [first-step] burden, the plaintiff must then demonstrate its claims have at least "minimal merit" ' "].)  Thus, to the extent that Kaplan's claims are time-barred, they may be subject to demurrer or summary disposition, but they are not a proper subject of a special motion to strike.  (See *Bonni, supra*, 11 Cal.5th at p. 1004 [under anti-SLAPP statute, plaintiff need not demonstrate arguable merit as to causes of action that do not arise out of protected activity].)

### C.     Intentional interference with contract, intentional interference with prospective economic advantage, and aiding and abetting breach of fiduciary duty (fourth, fifth, and seventh causes of action).

The elements of intentional interference with contract are (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  (*Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1603.)  The elements of intentional interference with prospective economic advantage are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  (*Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6.)  The elements of a claim for aiding and

27

abetting an alleged breach of fiduciary duty are " '(1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff.' " (*George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 641.)

The fourth and fifth causes of action reallege the existence of an express contract and/or economic relationship between Kaplan, Urbanski, and Osborne to make a film based on Kaplan's script, and they allege that Working Title engaged in intentional acts designed to induce a breach or disruption of that relationship—specifically, Working Title "sought to, and in fact did, poach Mr. Oldman from Mr. Kaplan's *Churchill* project so that Mr. Oldman could, and in fact did, star in *Darkest Hour*, produced by Working Title." The seventh cause of action alleges that Working Title was aware that a fiduciary relationship had arisen between Kaplan, Urbanski, and Osborne as a result of the express contract and "substantially assisted and/or encouraged [Urbanski and Osborne] to breach their fiduciary duties" by "poach[ing] Mr. Oldman" and "misappropriate[ing] ideas from Mr. Kaplan's script and utiliz[ing] those ideas in *Darkest Hour*." As a result, Kaplan was harmed "because the purpose of the joint venture was not fulfilled and his script was wrongfully appropriated for another film, [for] which he received no credit or compensation."

Defendants assert that "it is firmly established that casting decisions . . . constitute protected activity," and thus because Working Title is alleged to have " 'poached' " Oldman for the purpose of making Darkest Hour, these causes of action arise out

28

of protected activity. We do not agree. The injury-producing act alleged in the fourth, fifth, and seventh causes of action was persuading Oldman not to star in Kaplan's film, as a result of which "Mr. Kaplan's project did not move forward and was not developed into a feature film." That Oldman went on to make Darkest Hour explains *why* Working Title induced Oldman not to participate in Kaplan's film, but was not itself an element of Kaplan's injury—Kaplan would have suffered the same harm whether Oldman left Kaplan's project to make Darkest Hour or for a reason wholly unconnected with filmmaking. As such, the assertion in these causes of action that Oldman starred in Darkest Hour is " ' "merely incidental" ' " to these causes of action. (*Bonni*, *supra*, 11 Cal.5th at p. 1012.)[7]

Defendants also assert that these causes of action arise out of protected activity because they allege that Working Title misappropriated portions of Kaplan's script and used them in Darkest Hour. But as we have said, the injury-producing conduct on which this claim is based is failing to pay Kaplan for the use of his script, not making Darkest Hour. (See section A, *ante*.) Thus, this claim does not arise out of protected activity.

---

[7] For this reason, the present case is distinguishable from the cases on which defendants rely, both of which specifically arise out of the defendants' hiring decisions. (See *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1515 [discrimination complaint alleging that defendants refused to hire plaintiff because of his gender and age]; *Taylor v. Viacom Inc.* (C.D. Cal., June 5, 2018, No. CV173247DMGAFMX) 2018 WL 4959821, at *2 [tort action alleging defendant negligently cast reality television contestant].)

### D. Third cause of action for unfair competition.

The third cause of action alleges a violation of the Unfair Competition Law (UCL), Business and Professions Code section 17200. "The UCL defines 'unfair competition' as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.' (Bus. & Prof. Code, § 17200.) By proscribing 'any unlawful' business act or practice (*ibid*.), the UCL ' "borrows" ' rules set out in other laws and makes violations of those rules independently actionable." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.)

As defendants concede, the UCL claim "does not involve any stand-alone misconduct, and instead borrows from Kaplan's many other causes of action." Specifically, the third cause of action alleges that "[d]efendants' conduct, as alleged herein, constitutes an unlawful business practice because [defendants] misappropriated Mr. Kaplan's ideas and approaches from *Churchill*, tortiously interfered with Mr. Kaplan's business and the development and production of *Churchill* as a feature film, and/or breached their duties to Mr. Kaplan." These claims do not arise out of protected conduct for all the reasons discussed above.

Defendants also urge that, at a minimum, the special motion to strike should have been granted as to NBCUniversal and Focus Features, who are named in only the third cause of action and "are not alleged to have engaged in any misconduct." Further, defendants assert, the complaint "is bereft of any factual allegations relating to any relationship between Kaplan (or any of his associates) and these named parties." Not so. As suggested above, while the absence of substantive allegations against NBCUniversal and Focus Features may render the UCL claim

vulnerable to a demurrer or summary adjudication, it is not a proper subject of a motion to strike. (See *Bonni, supra,* 11 Cal.5th at p. 1004 [under anti-SLAPP statute, plaintiff need not demonstrate arguable merit as to causes of action that do not arise out of protected activity].)

For all of the above reasons, we conclude that none of Kaplan's causes of action arise out of protected activity within the meaning of the anti-SLAPP statute. We thus will affirm the trial court's order without considering whether the causes of action concern matters of public interest or have arguable merit.

## DISPOSITION

The order denying the special motion to strike is affirmed. Kaplan is awarded his appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

ADAMS, J.